IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

| | | |
|---|---|---|
| DEMIAN W.,[1] | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | Case No. 3:22-cv-660-DWD |
| | ) | |
| COMMISSIONER OF SOCIAL | ) | |
| SECURITY, | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM & ORDER

**DUGAN, District Judge:**

Under 42 U.S.C. §§ 405(g) and 1383(c)(3), Plaintiff seeks judicial review of the final agency decision of Defendant, which denied Plaintiff's application for Supplemental Security Income ("SSI"). As stated below, the Court **AFFIRMS** the final agency decision.

## I. Procedural History

Plaintiff was born on February 23, 1972. (Doc. 13-3, pg. 2). He applied for protective SSI on January 13, 2020, alleging a disability onset date of February 1, 2005. Plaintiff's alleged disability is related to schizoaffective disorder of the bipolar type. (Doc. 13-2, pg. 16). The claim was denied initially and on reconsideration. Plaintiff sought a hearing, which was held on October 21, 2021, before an Administrative Law Judge ("ALJ"). An Unfavorable Decision was issued to Plaintiff on November 19, 2021. (Doc. 13-2, pgs. 11-25). The Appeals Council denied a request for review, so Plaintiff has exhausted his administrative remedies. The ALJ decision is now ripe for judicial review.

---

[1] Plaintiff's full name will not be used due to privacy concerns.

## II. The Evidentiary Record

### A. Treatment and Prior Administrative Medical Findings

The initial administrative medical findings indicated Plaintiff was not disabled. (Doc. 13-3, pg. 16). The medical portion of that determination was performed by Dr. Howard Tin, Psy.D. (Doc. 13-3, pgs. 10, 15, 17). It was noted, during field office observations, Plaintiff was respectful, able to answer questions, and without limitations. (Doc. 13-3, pg. 7). Also, Plaintiff's treating sources from September 2019 indicated he was "doing well overall" and did not have worsening depression, anxiety, mania, hypomania, or psychotic symptoms. (Docs. 13-3, pg. 7; 13-7, pg. 29). He did not report suicidal or homicidal ideation, hallucinations, or paranoid ideation. (Docs. 13-3, pg. 7; 13-7, pg. 29).

A mental status examination revealed Plaintiff was "alert and oriented to person, place, and time." (Docs. 13-3, pg. 7; 13-7, pg. 21). He had a normal mood, affect, speech, behavior, judgment, thought content, cognition, and memory. (Docs. 13-3, pg. 7; 13-7, pg. 21). He was not actively hallucinating. (Docs. 13-3, pg. 7; 13-7, pg. 21). Plaintiff showed no homicidal or suicidal ideation, and he was attentive. (Docs. 13-3, pg. 7; 13-7, pg. 21).

Further, in October 2020, Plaintiff was observed by a consultative medical examiner, Dr. Harry Deppe, Ph.D., who is a licensed clinical psychologist. (Docs. 13-3, pg. 7; 13-7, pgs. 36-39). Plaintiff had no difficulty hearing, and his expressive verbalizations were audible and understandable. (Docs. 13-3, pg. 7; 13-7, pg. 37). Plaintiff's facial expressions and body mannerisms were appropriate, and he denied current or past episodes of hallucinations. (Docs. 13-3, pg. 7; 13-7, pg. 37). A delusional thought disorder was not evident. (Docs. 13-3, pg. 7; 13-7, pg. 37). Plaintiff had no

2

difficulty staying focused, staying on task, or providing coherent and relevant responses. (Docs. 13-3, pg. 7; 13-7, pg. 37). Plaintiff's judgment and insight were fair to good, reasoning skills were good, fund of general information was good, and ability to perform simple calculations was good. (Docs. 13-3, pg. 7; 13-7, pg. 38). Plaintiff had a fair ability to relate to others (including workers and supervisors), understand and follow simple instructions, maintain attention to perform simple or repetitive tasks, and withstand the stress and pressure of day-to-day work. (Docs. 13-3, pgs. 7-8; 13-7, pgs. 37-38). Plaintiff's prognosis was fair, despite "Bipolar Disorder, NOS." (Docs. 13-3, pg. 8; 13-7, pg. 38).

Plaintiff was found to have one or more medically determinable impairments, *i.e.*, a severe primary impairment of "Schizophrenia Spectrum and Other Psychotic Disorders" and a severe secondary impairment of "Depressive, Bipolar and Related Disorders." (Doc. 13-3, pg. 8). Plaintiff's limitation of understanding, remembering, or applying information was mild. (Doc. 13-3, pg. 8). He had a mild limitation when adapting or managing oneself and moderate limitations when interacting with others or concentrating, persisting, and maintaining pace. (Doc. 13-3, pg. 9).

Plaintiff's medically determinable impairments could reasonably be expected to produce limitations in understanding and memory, concentration and persistence, social interaction, and adaptation. (Doc. 13-3, pgs. 10-11). However, based on the longitudinal treatment records, Plaintiff's statements about the intensity, persistence, and functionally limiting effects of those symptoms were not substantiated by the objective medical evidence. (Doc. 13-3, pg. 11). Plaintiff's statements were only partially consistent. (Doc. 13-3, pg. 11). Plaintiff "[wa]s not as disabled as originally claimed." (Doc. 13-3, pg. 11).

3

In terms of a mental residual functional capacity ("RFC"), Plaintiff had no limits on the ability to remember, understand, or adapt. (Doc. 13-3, pg. 12). He did, however, have limitations on sustained concentration, persistence, and social interaction. (Doc. 13-3, pg. 12). Plaintiff was not significantly limited in the ability to carry out very short and simple instructions, perform activities within a schedule, maintain regular attendance, maintain punctuality within customary tolerances, sustain an ordinary routine without special supervision, make simple work decisions, complete a normal workday and workweek without interruptions from psychological symptoms, perform at a consistent pace without an unreasonable number or length of rest periods, ask simple questions and request assistance, accept instructions and respond appropriately to criticism, or maintain socially appropriate behavior and adhere to basic standards of neatness and cleanliness. (Doc. 13-3, pgs. 12-14). Plaintiff was moderately limited in the ability to carry out detailed instructions, maintain attention and concentration for extended periods, work in coordination with or in proximity to others without being distracted, interact appropriately with the general public, and get along with coworkers or peers without distracting them or exhibiting behavioral extremes. (Doc. 13-3, pgs. 12-14).

> For context, the administrative medical findings included the following narrative:
>
> Claimant is fully oriented and is free of serious memory problems. Claimant can remember locations or work-like procedures and can also understand and remember short[,] simple instructions[,] although the individual has difficulty remembering detailed instructions.
>
> Claimant can carry out short and simple instructions[,] but collateral claims that claimant has a short attention span of about 3 minutes, cannot complete tasks[,] and has problems following spoken and written instructions. Claimant does not handle stress nor changes in routine well. In performing

[activities of daily living ("ADLs")] and household tasks, collateral reports difficulty due to lack of motivation and drive. Claimant is able to leave home alone, shop in stores[,] and keep appointments. On the most recent [consultative examination] conducted by Harry Deppe dated 10/22/20, claimant was diagnosed with Bipolar Disorder. Claimant had been endorsed with Schizophrenia by History. Claimant's current [mental status examination] reveal[s] that claimant's judgment and insight were noted to be less than adequate. Claimant's [global assessment of functioning] value was not estimated. Mood was [within normal limits] and affect was appropriate to mood during the examination. He reported mood shifts. Claimant has difficulty carrying out detailed instructions and maintaining attention and concentration for extended periods of time, however the person is capable of performing simple tasks.

Claimant has difficulty in interacting appropriately with the general public and tend[s] to be afraid to be around people, so limit work tasks that do not require interaction with the general public.

Claimant has the ability to respond appropriately to changes in work settings, being aware of normal hazards[,] and travel in unfamiliar settings.

Claimant is capable of performing one and two-step tasks.

Claimant's statements are partially consistent[,] as allegation of disability is inconsistent with the ADLs, the most recent assessment(s)[,] and other data in the medical record. Claimant was diagnosed per all allegations but claimant's ADLs and [mental status examination] were not severely impaired. Claimant is prescribed psychotropic medication(s), according to the information found in the Case Data section in file. Claimant's allegation of thought disorder was not consistent with other evidence in file. He denied as such…. Claimant and collateral ADLs also did not cite as such. Claimant's allegation of the severity of the disorder is not consistent with claimant's ability to function generally well from day to day.

(Doc. 13-3, pgs. 14-15).

The assessment of vocational factors indicated "all potentially applicable Medical-Vocational Guidelines would direct a finding of 'not disabled' given the individual's age, education, and RFC. Therefore, the individual can adjust to other work." (Doc. 13-3, pg. 15). Plaintiff was limited to unskilled work. (Doc. 13-3, pg. 16). The following occupations

5

existed in significant numbers in the national economy: (1) reeler (paper goods); (2) drier attendant (garment); and (3) skin lifter, bacon (meat products). (Doc. 13-3, pg. 16).

Next, the administrative medical findings made on reconsideration indicated Plaintiff was not disabled. (Doc. 13-3, pg. 36). Dr. Ellen Rozenfeld, Psy.D., completed the medical portion of the findings. (Doc. 13-3, pg. 28). There was no new or changed mental condition or symptoms. (Doc. 13-3, pgs. 20, 27). As of September 2019, Plaintiff's "psych symptoms [we]re well controlled on meds." (Docs. 13-3, pg. 26; 13-7, pg. 30). As of April 2020, Plaintiff's "[j]udgment [w]as impulsive and inappropriate." (Docs. 13-3, pg. 26; 13-7, pg. 27). By September 2020, "[f]rom a psych standpoint, clmt [wa]s deemed to be stable...100% adherence to meds." (Docs. 13-3, pg. 25; 13-7, pg. 18). Plaintiff's mother stated Plaintiff was doing well, and Plaintiff adamantly denied psychological symptoms. (Docs. 13-3, pg. 25; 13-7, pg. 19). Plaintiff was alert and oriented to person, place, and time. (Docs. 13-3, pg. 25; 13-7, pg. 21). Plaintiff's mood, affect, speech, cognition, memory, and judgment were normal. (Docs. 13-3, pg. 25; 13-7, pg. 21). For additional evidence, the reconsidered findings referred to those summarized at the initial level. (Doc. 13-3, pg. 25).

The same medically determinable impairments were found on reconsideration. (Doc. 13-3, pg. 26). Plaintiff continued to have a mild limitation in the ability to understand, remember, and apply information. (Doc. 13-3, pg. 26). He continued to have a moderate limitation in the ability to interact with others and to concentrate, persist, and maintain pace. (Doc. 13-3, pg. 27). On reconsideration, though, Plaintiff had a moderate, rather than mild, limitation in the ability to adapt or manage oneself. (Doc. 13-3, pg. 27). It was noted that "[l]imitations [were] cited in all mental aspects of functioning. Ability

to pay attention per clmt is 'only a few minutes' and per collateral report, '2-3 minutes.' It is reported [that] he can follow only basic instructions. Statements partially consistent. Alleged severity not adequately supported by medical evidence." (Doc. 13-3, pg. 28).

Plaintiff's medically determinable impairments could reasonably be expected to produce limitations in understanding and memory, sustained concentration and persistence, social interaction, and adaptation. (Doc. 13-3, pg. 29). However, based on the ADLs, Plaintiff's statements about the intensity, persistence, and functionally limiting effects were not entirely substantiated by the objective medical evidence. (Doc. 13-3, pg. 29). Plaintiff's statements were only partially consistent. (Doc. 13-3, pg. 29).

In terms of an RFC, Plaintiff had no limits on the ability to remember or understand. (Doc. 13-3, pg. 30). He had, however, limitations on sustained concentration, persistence, social interaction, and adaptation. (Doc. 13-3, pgs. 30, 32). Plaintiff was not significantly limited in the ability to carry out very short and simple instructions, perform activities within a schedule, maintain regular attendance, maintain punctuality within customary tolerances, sustain an ordinary routine without special supervision, make simple work decisions, complete a normal workday and workweek without interruptions from psychological symptoms, perform at a consistent pace without an unreasonable number or length of rest periods, ask simple questions or request assistance, accept instructions or respond appropriately to criticism, maintain socially appropriate behavior and adhere to basic standards of neatness and cleanliness, know of normal hazards and take appropriate precautions, travel in unfamiliar places and use public transportation, or set realistic goals and make plans independent of others. (Doc. 13-3, pgs. 30-33).

Plaintiff was moderately limited in the ability to carry out detailed instructions, maintain attention and concentration for extended periods, work in coordination with or in proximity to others without being distracted, interact appropriately with the public, get along with coworkers or peers without distracting them or exhibiting behavioral extremes, and respond properly to changes in the work setting. (Doc. 13-3, pgs. 30-33).

It was noted that Plaintiff's ability to carry out tasks with adequate persistence and pace "would be moderately impaired for detailed/complex tasks but adequate for completion of routine, repetitive tasks." (Doc. 13-3, pg. 31). Similarly, it was found that Plaintiff "would do best in a work setting with incidental public contact; no sustained communication or problem solving with the public." (Doc. 13-3, pg. 32). He was capable of occasional coworker contact. (Doc. 13-3, pg. 32). Finally, it was noted that Plaintiff's adaptation limitations "could exacerbate in the face of perceived stressors, yet [he] c[ould] adapt to a setting in which duties are routine and predictable." (Doc. 13-3, pg. 33).

The assessment of vocational factors indicated "all potentially applicable Medical-Vocational Guidelines would direct a finding of 'not disabled' given the individual's age, education, and RFC. Therefore, the individual can adjust to other work." (Doc. 13-3, pg. 34). Plaintiff was limited to unskilled work due to his impairments. (Doc. 13-3, pg. 35).

### B. The Administrative Hearing[2]

An administrative hearing was held on October 21, 2021, at which time the ALJ heard from, *inter alia*, Dr. Jane Velez and Plaintiff's mother, Creta Schiermann. (Doc. 13-

---

[2]While the Court has reviewed the entire transcript of the administrative hearing, the discussion of that administrative hearing is limited to the portions relevant to Plaintiff's present arguments.

2, pg. 30). Dr. Velez is a licensed clinical psychologist and a forensic psychologist. (Doc.

13-2, pgs. 50, 53). Dr. Velez has done "a lot of courtroom work," and she "worked…Social

Security hearings and appeals for 25 years." (Doc. 13-2, pg. 53). However, Dr. Velez only

has a personal relationship with Plaintiff. (Doc. 13-2, pg. 54). She dated Plaintiff's uncle

for 13 years and "remain[s] very good friends with [Plaintiff] and the rest of his family."

(Doc. 13-2, pg. 54). Dr. Velez met Plaintiff 20 years ago. (Doc. 13-2, pg. 54). When asked if

she has counseled or treated Plaintiff, Dr. Velez responded, "[n]o, no, of course not,

because he is…[a] family friend, that would be inappropriate." (Doc. 13-2, pg. 54).[3]

Dr. Velez testified, two years before the administrative hearing, she attempted to

employ Plaintiff as a receptionist in her office. (Doc. 13-2, pg. 54). Dr. Velez experienced

"problems with that," as "people could tell right away on the phone…he was mentally

ill" or "something was not quite right." (Doc. 13-2, pgs. 55-56). Plaintiff would "try to joke

around with people at times and say very strange [or goofy] things, or he would be kind

of out of it." (Doc. 13-2, pgs. 55, 57). Plaintiff usually could not take down the right name

and seven-to-ten-digit phone number of callers. (Doc. 13-2, pgs. 55, 57). Plaintiff's

messages were "discombobulated" and contained "gibberish." (Doc. 13-2, pgs. 55, 57). If

Plaintiff received "shots for schizophrenia" and then came back to work, Dr. Velez would

---

[3] Despite this fact, the Court notes as follows. Based on her experiences with Plaintiff, which, again, did not include professional counseling or treatment, Dr. Velez testified "it was obvious that he had paranoid schizophrenia…[a]nd possibly disorganized schizophrenia." (Doc. 13-2, pgs. 56, 58). Plaintiff's adaptive functioning was extremely low, such that he could never live on his own, take care of himself, or hold any kind of job." (Doc. 13-2, pg. 57). Even when Plaintiff was on his medications, Dr. Velez stated "his level of psychosis and functional capacity would go up and down." (Doc. 13-2, pg. 58). Dr. Velez "kept telling" Plaintiff's mother to appeal the denial of SSI because she "know[s] many people that are much higher functioning than [Plaintiff] that are on disability." (Doc. 13-2, pg. 58).

have to retrain him on using the phone. (Doc. 13-2, pg. 56). Sometimes, Plaintiff "would just leave and he wouldn't tell [Dr. Velez] he was gone." (Doc. 13-2, pg. 55). Meanwhile, "the phone would be ringing off the hook, [and] [she] wouldn't have a clue where he was." (Doc. 13-2, pg. 55). Plaintiff's employment lasted 1-2 months. (Doc. 13-2, pg. 55).

Occasionally, Plaintiff would not shave or bathe and he would wear sunglasses, tape conversations, and talk to angels. (Doc. 13-2, pg. 58). Other times, Plaintiff would "hold it together better." (Doc. 13-2, pg. 58). Since the COVID-19 pandemic, *i.e.*, since early 2020, Dr. Valez had no "significant [in person] interaction" with Plaintiff. (Doc. 13-2, pgs. 58-60). Before that time, Dr. Velez was "spending a lot of time" with Plaintiff, including "weeks or months at [her] house." (Doc. 13-2, pgs. 58-59). Dr. Velez would take Plaintiff shopping and, on one occasion, "he picked out a book of nursery rhymes, which [Dr. Velez] thought was a very odd thing for a 40-something-year-old man to buy for himself." (Doc. 13-2, pg. 59). Dr. Velez wanted Plaintiff to acquire a smart phone, but he had no interest in doing so. (Doc. 13-2, pg. 59). Dr. Velez stated, "[h]e has no friends except me, and most of his relatives are a little bit afraid of him." (Doc. 13-2, pg. 59).

Plaintiff's mother, Creta Schiermann, testified at the administrative hearing.[4] Ms. Schiermann stated, other than when Plaintiff "went away for school," he has resided in her home. (Doc. 13-2, pg. 61). Ms. Schiermann manages Plaintiff's daily medication. (Doc. 13-2, pg. 61). She has "a routine set up…[where she] ha[s] to watch him put [the medication] in his mouth and swallow it, to make sure he takes it." (Doc. 13-2, pg. 62).

---

[4]Ms. Schiermann also submitted a third-party function report related to Plaintiff. (Doc. 13-6, pgs. 39-46). The Court notes that function report is consistent with the testimony provided by Ms. Schiermann at the administrative hearing. Portions of that function report have been incorporated into this section.

Ms. Schiermann is "very diligent" because he "created a lot of trouble for him[self]" when it was thought that he could manage his own medication. (Doc. 13-2, pg. 62). Plaintiff receives a shot related to his mental condition, but he was not getting those shots during the pandemic. (Doc. 13-2, pgs. 62, 68). In the past, if Plaintiff was off his medication, he would "curse[] almost everyone" and have the "police…called daily." (Doc. 13-6, pg. 44).

Ms. Schiermann requests that Plaintiff vacuum, clean his bathroom, and clean his bedroom, but it is difficult for him to do anything right away because he "has to sit and get it into his mind." (Doc. 13-2, pg. 63). Once Plaintiff begins such a task, like vacuuming, "he runs it for a little bit, and he goes and sits back down." (Doc. 13-2, pg. 63). Plaintiff will state, "I'm so tired." (Doc. 13-2, pg. 63). Ms. Schiermann testified, "you really have to stay on him to get him to do something, and you have to model and show him how to do things." (Doc. 13-2, pg. 63). Plaintiff does not prepare meals or use the stove, but he can shop in stores and count change. (Docs. 13-2, pg. 59; 13-6, pg. 42). Plaintiff cannot manage a checking or savings account. (Doc. 13-6, pgs. 42-43).

Ms. Schiermann described Plaintiff's sense of sanitation and cleanliness as "not very functional." (Doc. 13-2, pg. 63). She must remind Plaintiff to trim his fingernails. (Doc. 13-2, pg. 63). Also, Plaintiff will sometimes put his clothes on "wrong side out, [or]…backwards." (Doc. 13-2, pg. 63). Other times, Plaintiff will put his socks on over his pants or have one sock up and the other sock down. (Doc. 13-2, pg. 63). Plaintiff has walked around in public "with his feet out of his shoes." (Doc. 13-2, pg. 63). Plaintiff bathes regularly, but Ms. Schiermann "constantly remind[s] him about sanitation" and "it's a big issue, just trying to keep [him] looking presentable." (Doc. 13-2, pgs. 63-65).

Plaintiff's social interaction is limited to walking or riding a bike to McDonald's, the library, or the movie theatre. (Docs. 13-2, pg. 64; 13-6, pgs. 42-43). If Plaintiff is in a good mood, then he will say "hi" and ask "how are you?" to persons he encounters. (Doc. 13-2, pg. 64). If he is in a bad mood, then Plaintiff will "just shut[] down." (Doc. 13-2, pg. 64). Also, Plaintiff "is very, very sensitive" and not resilient. (Docs. 13-2, pg. 64; 13-6, pg. 39). Ms. Schiermann indicated, with the "ups and downs of life, it's very difficult for [Plaintiff] to deal with anything that puts any pressure on him." (Doc. 13-2, pg. 64). She does not believe Plaintiff "function[s] well in group settings." (Doc. 13-6, pg. 39).

Ms. Schiermann, who was 74 years old, is "very concerned" about what will happen to Plaintiff when she is no longer around. (Doc. 13-2, pg. 65). He leaves doors to their home "wide open." (Doc. 13-2, pg. 65). Plaintiff, who is "very childlike" and "not conscious of adult responsibilities," does not think "I need to…lock the doors." (Docs. 13-2, pg. 65; 13-6, pg. 39). Plaintiff's notes are "gibberish," and his comments "do not make sense and…are not functional for living in the adult world." (Doc. 13-2, pgs. 66-67).

### III. General Legal Standards

To qualify for SSI, a claimant must be disabled. To assess an alleged disability, the ALJ employs a "five-step sequential evaluation process." *See* 20 C.F.R. §§ 404.1520(a)(1), (2), (4); 416.920(a)(1), (4). The ALJ asks whether: (1) the claimant is doing substantial gainful activity; (2) the claimant has a severe medically determinable physical or mental impairment that meets certain duration requirements or a combination of impairments that is severe and meets the duration requirements; (3) the claimant has an impairment that meets or equals one of the impairments listed in the regulations and satisfies the

duration requirements; (4) in view of the claimant's RFC and past relevant work, he can perform past relevant work; and (5) in view of the claimant's RFC, age, education, and work experience, he can adjust to other work. *See* 20 C.F.R. §§ 404.1520(a)(4)-(g); 416.920(a)(4)-(g); *Young v. Barnhart*, 362 F.3d 995, 1000 (7th Cir. 2004).

If the claimant is doing substantial gainful activity under step 1, does not have an impairment or combination of impairments as described at step 2, can perform past relevant work under step 4, or can adjust to other work under step 5, then the claimant is not disabled. *See* 20 C.F.R. §§ 404.1520(a)(4)(i),(ii), (iv), (v); 416.920(a)(4)(i), (ii), (iv), (v). If the claimant has an impairment that meets the requirements of step 3 or is incapable of adjusting to other work under step 5, then he is disabled. *See* 20 C.F.R. §§ 404.1520(a)(4)(iii), (v); 416.920(a)(4)(iii), (v). The claimant has the burden of proof at steps 1 to 4. *See Mandrell v. Kijakazi*, 25 F.4th 514, 516 (7th Cir. 2022). At step 5, the burden of proof shifts to the Commissioner of Social Security to show that the claimant can adjust to other work existing in "a significant number of jobs…in the national economy." *See Young*, 362 F.3d at 1000; *accord Brace v. Saul*, 970 F.3d 818, 820 (7th Cir. 2020).

At step 3, most mental impairment listings require two "marked" limitations or one "extreme" limitation under the "paragraph B" criteria, which include: (1) understanding, remembering, or applying information; (2) interacting with others; (3) concentrating, persisting, or maintaining pace; and (4) adapting or managing oneself. *See Thompson v. Saul*, 470 F. Supp. 3d 909, 912 (E.D. Wisc. 2020). Impairments and related symptoms may cause physical and mental limitations that affect the ability to work. *See* 20 C.F.R. §§ 404.1545(a)(1); 416.945(a)(1). Steps 4 and 5 assess the most a claimant can

do at work, despite those limitations. *See* 20 C.F.R. §§ 404.1545(a)(1); 416.945(a)(1); *accord* SSR 96-8p, 1996 WL 374184, *2; *Clifford v. Apfel*, 227 F.3d 863, 872-73 n. 7 (7th Cir. 2000). In this way, an RFC assesses the ability to perform sustained physical and mental activities in a work setting on a regular and continuing basis, *i.e.*, for eight hours a day and five days a week or an equivalent schedule. *See Tenhove v. Colvin*, 97 F. Supp. 2d 557, 568 (E.D. Wisc. 2013); SSR 96-8p, 1996 WL 374184, *2; *accord Moore v. Colvin*, 743 F.3d 1118, 1121 (7th Cir. 2014). An RFC must be based on the relevant medical and other evidence of record. *See* 20 C.F.R. §§ 404.1545(a)(3); 416.945(a)(3); SSR 96-8p, 1996 WL 374184, *2-3, 5.

When completing an RFC, the ALJ considers all impairments, including nonsevere impairments, and the claimant's ability to meet physical, mental, sensory, and other work requirements. *See* 20 C.F.R. §§ 404.1545(a)(2), (4); 416.945(a)(2), (4); *see also Alesia v. Astrue*, 789 F. Supp. 2d 921, 933 (N.D. Ill. 2011) ("[T]he ALJ must consider the combined effect of all impairments, 'even those that would not be considered severe in isolation.' "). "An impairment or combination of impairments is not severe if it does not significantly limit [the] physical or mental ability to do basic work activities." 20 C.F.R. §§ 404.1522(a); 416.922(a). A limited ability to do mental activities, such as understand, remember, carry out instructions, and respond to supervision, co-workers, and work pressures, may reduce the ability to do "other work" at step 5. *See* 20 C.F.R. §§ 404.1545(c); 416.945(c).

## IV. The ALJ's Decision[5]

The ALJ assessed Plaintiff's alleged disability under the five-step sequential

---

[5]As with the discussion of the administrative hearing, the Court generally limits its discussion of the ALJ's decision to those portions that are challenged by Plaintiff in his brief.

evaluation process. The ALJ noted its consideration of Plaintiff's medical history and the testimony of, *inter alia*, Plaintiff's mother and Dr. Velez, who was referred to as a family friend. (Doc. 13-2, pg. 14). Based on all of the record evidence, the ALJ found Plaintiff was not disabled after January 13, 2020, when he applied for SSI. (Doc. 13-2, pgs. 14, 25).

At step one, the ALJ found Plaintiff had not engaged in substantial gainful activity since January 13, 2020, when he applied for SSI. (Doc. 13-2, pg. 16). At step two, the ALJ found Plaintiff had severe impairments that significantly limited his ability to perform basic work activities, *i.e.*, schizoaffective disorder of the bipolar type. (Doc. 13-2, pg. 16).

At step 3, the ALJ found Plaintiff did not suffer from an impairment or combination of impairments that met or medically equaled the severity of an impairment listed in the regulations. (Doc. 13-2, pg. 16). As part of this finding, the ALJ detailed its consideration of the "paragraph B" criteria in the context of the specific medical and nonmedical evidence of record. (Doc. 13-2, pgs. 16-19). For example, the ALJ noted, in detail, its consideration of Plaintiff's medical records, including a mental status examination, from April and September 2020. (Doc. 13-2, pgs. 17-18). The same was done for the consultative psychological evaluation from October 2020. (Doc. 13-2, pgs. 17-18).

Relevant to Plaintiff's present arguments, the ALJ discussed Plaintiff's mother's testimony. The ALJ noted she "testified that the claimant has little social interaction, but that he walks to McDonald's every day." (Doc. 13-2, pg. 17). The ALJ further noted that "the claimant's mother testified that she manages the claimant's medications." (Doc. 13-2, pg. 17). Ultimately, since Plaintiff was found to have only moderate limitations, the ALJ concluded the "paragraph B" criteria were not satisfied. (Doc. 13-2, pgs. 17-18).

Before proceeding to step 4, the ALJ assessed Plaintiff's RFC based on the longitudinal and object medical evidence of record, finding as follows:

> I find that the claimant has the residual functional capacity to perform a full range of work at all exertional levels but with the following nonexertional limitations: he can maintain the concentration required to perform simple routine tasks, remember work procedures, and make simple work-related decisions. The claimant cannot work at a fast pace, such as an assembly line, but can stay on task and meet reasonable production requirements in an environment that allows him to maintain a flexible and goal-oriented pace. The claimant is further limited to work that requires only occasional changes in the work setting which are introduced gradually. Additionally, he can have occasional interaction with co-workers, supervisors, and the public.

(Doc. 13-2, pgs. 19, 23).

As at step 3, the ALJ expressly stated, "[i]n making this finding, I have considered all symptoms and the extent to which these symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence." (Doc. 13-2, pg. 19). The ALJ's decision was based on "the medical opinions and prior administrative medical findings." (Doc. 13-2, pg. 19). The ALJ "consider[ed]…all the evidence presented related to the claimant's prior work history, and the observations of non-medical third parties." (Doc. 13-2, pg. 19). The ALJ noted, "whenever statements about the intensity, persistence, or functionally limiting effects of pain or other symptoms are not substantiated by objective medical evidence, I must consider other evidence in the record to determine if the claimant's symptoms limit the ability to do work-related activities." (Doc. 13-2, pg. 20). As to the testimony of Plaintiff's mother and Dr. Velez, the ALJ stated:

> The claimant has alleged disability due to bipolar and schizophrenia…. He has reported that his impairments affect [t]he ability to remember, complete tasks, concentrate, understand, follow instructions, and get along with

> others…. [T]he claimant's mother, has reported similar observations…. Dr. Valez [*sic*], a friend of the claimant's family, testified that she has known the claimant for 20 years, but that she has never treated him. However, she stated that she had tried to give the claimant a receptionist job, but that the claimant was unable to properly perform the job, as he could not take down phone messages accurately and would often leave the job site without warning. Further, the claimant's mother testified that she manages the claimant's medications…. She reported that the claimant has little social interaction, but that he walks to McDonald's every day.

(Doc. 13-2, pg. 20).

Based on the evidence of record, the ALJ found Plaintiff's medically determinable impairments could be expected to cause the alleged symptoms, but his statements about the intensity, persistence, and limiting effects of those symptoms were not entirely consistent with the medical and other evidence of record. (Doc. 13-2, pg. 20). The ALJ again detailed the medical evidence, including the medical records and mental status examination from April and September 2020, the consultative psychological evaluation from October 2020, and the prior administrative medical findings of Drs. Tin and Rozenfeld. (Doc. 13-2, pgs. 20-22). The prior administrative medical findings were "generally persuasive, as they [we]re supported by [Drs. Tin and Rozenfeld's] review of the record, which is consistent with the ability to perform unskilled work with some additional social restrictions." (Doc. 13-2, pg. 20). To the extent the medical evidence conflicted with the ALJ's findings, the ALJ explained why particular medical evidence, *e.g.*, the "extreme limitations" noted in the April 2020 medical records and the "vague and…limited probative value" of the assessment of Plaintiff's functioning by Dr. Deppe in the consultative psychological examination, were unpersuasive or partially persuasive and inconsistent with the objective medical evidence. (Doc. 13-2, pgs. 22-23).

At step 4, the ALJ found Plaintiff had no past relevant work. (Doc. 13-2, pg. 23). At step 5, the ALJ found, based on Plaintiff's age, education, work experience, and RFC, he could successfully adjust to other work that exists in significant numbers in the national economy. (Doc. 13-2, pg. 24). For these reasons, the ALJ concluded Plaintiff was not disabled as of January 13, 2020, when he applied for SSI. (Doc. 13-2, pg. 25).

## V. Analysis

The Court's review of the ALJ's decision is "extremely limited" and "very deferential." *See* 42 U.S.C. § 405(g); *Jarnutowski v. Kijakazi*, 48 F.4th 769, 773 (7th Cir. 2022) (quoting *Elder v. Astrue*, 529 F.3d 408, 413 (7th Cir. 2008)). Findings of fact, supported by substantial evidence, are conclusive. *See* 42 U.S.C. § 405(g); *accord Clifford*, 227 F.3d at 869. The Court will reverse the ALJ's decision only if the findings of fact were not supported by substantial evidence or the ALJ applied the wrong legal standard. *See Clifford*, 227 F.3d at 869; *accord Martin v. Saul*, 950 F.3d 369, 373 (7th Cir. 2020). "Substantial evidence means 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.' " *See Clifford*, 227 F.3d at 869 (quoting *Richardson v. Perales*, 402 U.S. 389, 401 (1971)); *accord Jarnutowski*, 48 F.4th at 773. If reasonable minds could differ about the alleged disability and the ALJ's decision is supported by substantial evidence, then the Court will affirm the ALJ. *See Jarnutowski*, 48 F.4th at 773 (quoting *Elder*, 529 F.3d at 413). The Court reviews the entire record, but does not reweigh the evidence, resolve conflicts, decide credibility, or substitute its judgment for that of the ALJ. *See Clifford*, 227 F.3d at 869; *accord Lopez ex rel. Lopez v. Barnhart*, 336 F.3d 535, 539 (7th Cir. 2003). However, an ALJ must build a logical bridge between the evidence and the conclusions.

18

*See Jarnutowski*, 48 F.4th at 773 (quoting *Butler v. Kijakazi*, 4 F.4th 498, 501 (7th Cir. 2021)).

Now, Plaintiff argues the ALJ ignored the hearing testimony of his mother and Dr. Velez. (Doc. 19, pgs. 2, 6). When doing so, Plaintiff concedes the ALJ is not required to evaluate every piece of evidence. (Doc. 19, pg. 7). Plaintiff also admits the ALJ need not discuss a third-party statement if that statement "serves to corroborate the plaintiff's testimony and is therefore 'essentially redundant.' " (Doc. 19, pg. 7).

However, Plaintiff submits Dr. Velez's testimony constitutes a separate line of evidence because she had firsthand knowledge of Plaintiff's failed work attempt and inability to perform basic work tasks. (Doc. 19, pg. 7). In other words, Dr. Velez's testimony supports the argument that Plaintiff "would be off task more than customarily allowed in unskilled occupations," needs a sheltered work environment, and should not be interacting with the public (Doc. 19, pg. 7). Although Plaintiff concedes Dr. Velez is his "family friend…[of] approximately 20 years" who has not formally provided him medical treatment, Plaintiff maintains Dr. Velez was "beyond qualified to testify about mental impairments and is likely familiar with the Social Security Administration's rules and regulations[,] as she has testified as an expert witness for 25 years." (Doc. 19, pgs. 6-7).[6] Similarly, Plaintiff argues his mother's "ignored testimony is important when considered alongside the ignored testimony" of Dr. Velez, as that testimony also supports the assertion that Plaintiff cannot stay on task and requires a sheltered work environment.

---

[6]Notably, Plaintiff's attorney indicated to the ALJ, "I wanted the claimant's mother…and Dr. Velez to testify…because I think their testimony strongly supports my argument that the claimant is go[ing] to end up in a…work situation…[where] it would have to be a sheltered situation where [the] supervisor [i]s constantly keeping him on task and reminding him how to do things." (Doc. 13-2, pg. 67).

Contrary to these arguments, Defendant claims the ALJ did, in fact, consider the testimony of Plaintiff's mother and Dr. Velez when rendering a decision based on the entire record. (Doc. 21, pg. 1). Defendant states, "Plaintiff does not engage at all with the ALJ's decision, [but] instead cit[es]…testimony from the hearing." (Doc. 21, pg. 2). That lack of engagement with the ALJ's decision, Defendant continues, "dooms Plaintiff's argument because even a cursory review…shows that…the ALJ *did not* ignore the[] reports" of his mother or Dr. Velez. (Doc. 21, pg. 2) (Emphasis in original). Even if this were not the case, Defendant argues, consistent with the concessions of Plaintiff, the ALJ was not required to mention every report of third parties. (Doc. 21, pgs. 2-3). Further, while Dr. Velez is a licensed clinical psychologist, Defendant argues she is not an "acceptable medical source" or "medical source" under the regulations, as Dr. Velez was not working within the scope of her practice. (Doc. 21, pg. 3). Instead, Defendant notes that Dr. Velez admitted she made the conscious decision not to treat Plaintiff, due to a conflict of interest, and was testifying as Plaintiff's family friend. (Doc. 21, pg. 3 n. 1).

Alternatively, Defendant argues the ALJ's decision was supported by substantial evidence, including the objective medical records, the prior administrative findings, and the medical opinion of a consultative examiner. (Doc. 21, pgs. 3-4). Despite a history of schizoaffective disorder of the bipolar type, Defendant argues Plaintiff's medical records reflect "relatively normal functioning." (Doc. 21, pgs. 3-4). That is, the medical evidence of record reflects that Plaintiff often shows normal attention, perception, thought content, cognition and memory, judgment, and normal and cooperative behavior. (Doc. 21, pgs. 3-4). Likewise, the consultative examination revealed "generally normal functioning," as

Plaintiff had no difficulty staying focused or on task, gave coherent and relevant responses, was fully oriented, had good memory and fund of knowledge, showed normal abstract reasoning, and demonstrated fair to good judgment and insight. (Doc. 21, pg. 4). Finally, Defendant points out that the prior administrative findings of the psychological consultants were that Plaintiff's mental impairments were not disabling. (Doc. 21, pg. 4).

Now, it is true that "an ALJ 'need not provide a complete written evaluation of every piece of testimony and evidence.' " *See Curvin v. Colvin*, 778 F.3d 645, 651 (7th Cir. 2015) (quoting *Shideler v. Astrue*, 688 F.3d 306, 310 (7th Cir. 2012)). Further, while an ALJ must consider third-party evidence, including from family and friends, such evidence is not considered under the same standards as medical findings and opinions. *See Pribnow v. Kijakazi*, No. 21-cv-1238, 2023 WL 3061515, *21 (E.D. Wisc. April 24, 2023) (quoting 20 C.F.R. §§ 416.945(a)(3), 416.929(c)(3); *Norman P. v. Kijakazi*, No. 21-cv-2542, 2022 WL 3908126, *4 (S.D. Ind. Aug. 31, 2022) (citing 20 C.F.R. § 404.1529). An ALJ is "not required to articulate how…[it] considered evidence from nonmedical sources using the requirements in paragraphs (a) through (c)" of §§ 404.1520c and 416.920c, which relate to medical opinions and prior administrative medical findings. *See* 20 C.F.R. §§ 404.1520c(d), 416.920c(d); *see also* 20 C.F.R. §§ 404.1502(e)(4), 416.902(j)(4) ("Nonmedical source means a source of evidence who is not a medical source," which "includes, but is not limited to…[f]amily members, caregivers, friends, neighbors, employers, and clergy"); *compare* §§ 404.1502(d), 416.902(i) (stating, relevant to Dr. Velez, a "medical source" is "an individual who is licensed as a healthcare worker by a State *and working within the scope of practice* permitted under State or Federal law") (Emphasis

added.). ALJs must merely build a logical bridge between the evidence and conclusions. *See Jarnutowski*, 48 F.4th at 773; *see also Clifford*, 227 F.3d at 872 ("While the ALJ is not required to address every piece of evidence, he must articulate some legitimate reason for his decision."); *Andrew L. v. Kijakazi*, No. 20-cv-1609, 2021 WL 5447035, *4 (N.D. Ill. Nov. 22, 2021) ("Section 1520c requires at least minimal articulation of how nonmedical evidence was considered. While an ALJ's analysis need not be extensive, some articulation is needed to allow the court to meaningfully assess whether the ALJ applied the correct legal standards and supported her decision with substantial evidence.").

Also, "ALJs are not required to incorporate…[third-party] statements into the RFC and may discount the testimony if they find that it conflicts with the medical evidence or otherwise lacks credibility." *See Smith v. Colvin*, 9 F. Supp. 3d 875, 889 (E.D. Wisc. 2014) (citing *Arnold v. Barnhart*, 473 F.3d 816, 821-22 (7th Cir. 2007); *Cirelli v. Astrue*, 751 F. Supp. 2d 991, 1008-09 (N.D. Ill. 2010)); *accord Pribnow*, 2023 WL 3061515, *21. To the extent credibility is an issue, the ALJ must "give[] specific reasons," supported by the record, for its determination, which cannot be "patently wrong." *See Curvin*, 778 F.3d at 651.

Here, the Court finds the ALJ did not ignore the third-party testimony of Plaintiff's mother or Dr. Velez but instead discussed that testimony, in context, with the objective medical evidence of record. Although it did not include a "complete written evaluation" of the third-party testimony, the ALJ noted its consideration of the testimony and summarized the portions deemed relevant to the "paragraph B" criteria and the RFC. *See Curvin*, 778 F.3d at 651; *see also Edilburg A. v. Kijakazi*, No. 21-cv-5058, 2022 WL 17718392, *4 (Dec. 15, 2022) (the ALJ "specifically noted" third-party evidence from the plaintiff's

wife and was correct that it did not have to articulate its consideration of that evidence using the requirements contained in § 416.920c(a)–(c), such that the plaintiff's argument that his RFC assessment would have been different if the ALJ "truly considered" the third-party evidence "amount[ed] to an impermissible request for a re-weighing of the evidence"); (Doc. 13-2, pgs. 17-20). Notwithstanding its consideration of that testimony, though, the ALJ found the evidence, including that from objective medical sources, indicated only moderate limitations on the "paragraph B" criteria. (Doc. 13-2, pgs. 17-18).

Likewise, when assessing Plaintiff's RFC, the ALJ "consider[ed]…the claimant's prior work history[] and the observations of non-medical third parties," *i.e.*, Plaintiff's mother and Dr. Velez.[7] (Doc. 13-2, pg. 19). The ALJ specifically recounted, in summary form, the testimony of those third-party witnesses. (Doc. 13-2, pg. 20). Ultimately, though, the ALJ found its RFC was supported by the entirety of the evidence, including the objective medical evidence, in the record. (Doc. 13-2, pgs. 20-23). In other words, the ALJ considered the third-party testimony of Plaintiff's mother and Dr. Velez before pinpointing an RFC that was supported by the entirety of the evidence, including the objective medical evidence that was discussed in detail. *See Winsted v. Berryhill*, 923 F.3d 472, 478 (7th Cir. 2019) (rejecting the argument that the ALJ erred in giving little evidentiary weight to an RFC assessment, where, *inter alia*, the witness report was from someone who was not an "acceptable medical source" and the ALJ found the report was

---

[7] The Court notes Dr. Velez did not have "significant [in person] contact" with Plaintiff since the beginning of 2020 due to the COVID-19 pandemic. (Doc. 13-2, pgs. 58-60). Also, Plaintiff's work attempt, as a receptionist in Dr. Velez's office, occurred two years before the administrative hearing, *i.e.*, in approximately October 2019. (Doc. 13-2, pg. 54). These facts are notable because, in this case, the question for the ALJ was whether Plaintiff was disabled since January 13, 2020, when he applied for SSI.

inconsistent with the medical record as a whole); (Doc. 13-2, pgs. 19-23). When doing so, the ALJ minimally articulated its consideration of the third-party testimony and adequately built a logical bridge between the evidence and conclusions. *See Jarnutowski*, 48 F.4th at 773; *Clifford*, 227 F.3d at 872; *Andrew L.*, 2021 WL 5447035, *4; *see also Wright v. Saul*, No. 20-cv-261, 2021 WL 4272888, *9 (N.D. Ind. Sept. 21, 2021) (the ALJ satisfied "the minimal articulation standard," such that there was no error in the assessment of third-party evidence, where the ALJ "considered the evidence submitted by…[the plaintiff's] mother, but nonetheless concluded her opinions on the degree, frequency, and duration of…[his] medical needs…were inconsistent with the balance of the record evidence").

Finally, the Court notes Plaintiff's brief is limited to the argument that the ALJ ignored the testimony of Plaintiff's mother and Dr. Velez. In other words, Plaintiff does not otherwise suggest the ALJ's decision was unsupported by substantial evidence. Even if Plaintiff had done so, though, the Court would find from its comprehensive review of the record that the ALJ's decision was supported by substantial evidence.

## VI. Conclusion

For these reasons, the Court **AFFIRMS** the final agency decision of Defendant. The Clerk of the Court is **DIRECTED** to enter judgment for Defendant and against Plaintiff.

**SO ORDERED.**

Dated: September 20, 2023.

s/ *David W. Dugan*
_____
DAVID W. DUGAN
United States District Judge